

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-0354-10

### THE STATE OF TEXAS

### v.

### CORY CASTLEBERRY, Appellee

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FIFTH COURT OF APPEALS
### DALLAS COUNTY

KEASLER, J., delivered the opinion of the Court in which KELLER, P.J., MEYERS, PRICE, WOMACK, and HERVEY, JJ., joined. JOHNSON, J., concurred. COCHRAN, J., dissented.

## O P I N I O N

Early one May morning in 2008, Officer Barrett was patrolling an urban area where recent burglaries had occurred. He approached Cory Castleberry and another man walking behind a closed business and asked them for identification. Castleberry then reached for his waistband, and Officer Barrett told him to raise his hands. Castleberry reached in his

waistband and threw down a baggie of cocaine. We must decide whether the cocaine was admissible. We conclude that it was.

**Background**

The State charged Castleberry with possession of cocaine. Before trial, Castleberry moved to suppress cocaine found by Officer Barrett of the Dallas Police Department (DPD).

At approximately 3:00 a.m. on May 31, 2008, Officer Barrett was patrolling the Cedar Springs-Lemmon-Maple area of town, which is a mix of bars, shops, apartment buildings, and residences. Officer Barrett described the area as having one of the "higher crime rates." Before May 31st, the DPD had caught "quite a few burglars" in the area. Officer Barrett's superior had been "hounding [him] to get after" the burglaries. So, when he noticed two men walking behind a closed business in an area lit by ambient light, he became suspicious.

To determine "what they [were] doing back there at that time," Officer Barrett's partner dropped Officer Barrett off in front of one of the businesses so that Officer Barrett could circle around and approach the two men from behind. While Officer Barrett was circling on foot, his partner drove around the other direction so that he could approach the men from the front. Officer Barrett testified that, as he approached the two men, he "probably asked them for ID [and] questioned them why they were walking through there." He went on to testify that upon requesting identification from the two men, Castleberry "was kind of reaching for his waistband" and "I d[id not] know, if he ha[d] a gun or knife . . . ." When the prosecutor asked Officer Barrett to explain the significance of someone reaching

for their waistband, Officer Barrett stated, "That's commonly where weapons are carried, in the front waistband, underneath an untucked shirt." Castleberry testified that his shirt was untucked.

When Castleberry reached for his waistband, Officer Barrett immediately instructed him to put his hands above his head, which is what he "commonly" does in order to "gain control" so he can "do a patdown." When told to put his hands above his head, Castleberry again reached for his waistband. Officer Barrett ordered Castleberry to put his hands behind his back so he could conduct a *Terry* frisk, at which time Castleberry reached for his waistband for a third time. Officer Barrett stated that Castleberry "[p]ull[ed] his right hand away from my control back towards the front of his waistband" and "that's when he threw the baggie." Officer Barrett determined that the baggie contained cocaine and arrested Castleberry.

Officer Barrett testified that when he first noticed Castleberry and his companion, neither man was carrying a duffle bag nor any tools that could be used in a burglary and that nothing about them was out of the ordinary for two people walking down the street. He also testified that he determined that Castleberry was not carrying a weapon. He made this determination after Castleberry had thrown down the baggie containing cocaine. When questioned by the prosecutor, Officer Barrett first described the area of the arrest as dark, but, later, when questioned by the trial judge, he admitted that the area was lit by ambient light.

Castleberry testified that he was walking from a bar to his apartment, which was

located approximately one block from where he was arrested. He explained that the area was "well lit enough where you could, you know, see what's going on." And when the prosecutor asked Castleberry if the area was dangerous, he answered, "No, it's not dangerous at all." Castleberry testified that he always cuts through "the parking lot of the back of Uncle Julio's, to go to [his] apartment after walking down on Lemmon." Castleberry also testified that he was carrying a compact disc in his waistband and that his companion was not carrying anything. Then Castleberry admitted that "an officer in a place that . . . isn't completely well lit . . . coming up on two people he doesn't know and one of them reaches . . . to his waistband . . . has reason to be concerned." And when the trial judge asked Castleberry if there was foot traffic in that area at 3:00 a.m., he stated that "[t]here's quite a bit, actually . . . ." The trial judge granted Castleberry's motion to suppress and entered written findings of fact and conclusions of law, which state, in relevant part:

- On May 31, 2008, Officer Russell Barrett, while on routine patrol, came in contact with Corey Castleberry in the Cedar Springs/Lemon Avenue/Maple area of Dallas, Texas.

- The contact occurred at approximately 3:00 a.m. behind a restaurant named Uncle Julio's.

- Officer Barrett described the area as "high crime" and said a few burglars had recently been caught in the area. Officer Barrett's superior officer was pressuring him and other officers to "get after" the burglaries.

- Officer Barrett exited his vehicle and approached Castleberry on foot while his partner circled around behind in his cruiser.

- Officer Barrett first described the area as "dark" but later clarified that

remark by indicating that "ambient light" from nearby businesses lit the area enough so that one could walk without additional lighting.

- Officer Barrett approached Castleberry for the express purpose of obtaining his identification and determining why he was there at that time of night.

- At the time Officer Barrett approached Castleberry, he did not have any reason to believe that a crime had occurred, was occurring, or was about to occur. Castleberry was not carrying anything that looked like a weapon or burglary tool. When Officer Barrett first observed Castleberry, Castleberry was doing nothing more than simply walking in a public area behind a closed business.

- When Officer Barrett first approached Castleberry, Officer Barrett had no information that would lead him to believe that Castleberry was a threat to anyone.

- In response to a request for identification, Castleberry reached for his waistband, a common place for carrying identification. Officer Barrett noted that the waistband is a common place to carry weapons, but he admitted that he did not know if Castleberry had a weapon.

- None of Castleberry's actions indicated that Officer Barrett or anyone else was in jeopardy.

- When Castleberry reached for his waistband, a place where identification is normally kept, in response to Officer Barrett's request for identification, Officer Barrett ordered Castleberry to place his hands in the air. This effectuated a detention of Castleberry. The reason Officer Barrett ordered Castleberry to place his hands in the air was so that Officer Barrett could gain control of Castleberry and conduct a pat down search.

- Any items seized after the detention were a direct result of the initiation of the detention.

- The State's power to invade a citizen's privacy is limited by the requirement that searches and seizures must be supported by a showing of probable cause.

- A lower standard of reasonable suspicion is derived from probable cause and applies to brief detentions, which fall short of being full-scale searches or seizures.

- No stop or detention is permissible when the circumstances are not reasonably consistent with criminal activity. In such a case, the investigation is based only on mere curiosity, rumor, or hunch.

- The circumstances must amount to more that an inchoate and unparticularized suspicion or hunch. The reasonableness of a temporary detention must be examined in terms of the totality of the circumstances. The detention will be justified when the detaining officer has specific articulable facts, either known personally or through the collective knowledge of other officers, which taken together with rational inferences from those facts, lead the officer to conclude that the person detained is, has been, or soon will be engaged in criminal activity or poses a threat to officer safety.

- Officer Barrett failed to provide any articulable facts or rational inferences therefrom that Castleberry had been, was, or soon would be engaged in criminal activity. Nor did Officer Barrett provide any articulable facts or rational inferences therefrom that Castleberry posed any threat to Officer Barrett. Thus, Officer Barrett exceeded his authority in detaining Castleberry.

- Any items seized as a fruit of this constitutionally impermissible detention are ordered suppressed.

### Court of Appeals

The State appealed the trial judge's ruling on Castleberry's suppression motion. In

its opinion, the court of appeals agreed with the trial judge's finding of fact:

> At the time Officer Barrett approached [Castleberry] and his companion, he did not have any reason to believe that a crime had occurred, was occurring, or was about to occur . . . [that Castleberry and his companion] were doing nothing more than simply walking in a public area behind a closed business . . . [and that] [a]t the time Officer Barrett approached [Castleberry] and his

companion he did not have any information which would lead him to believe that [Castleberry] was a threat to the Officer or any other person.[1]

Agreeing with the trial judge, the court of appeals found that Officer Barrett went "too far" when he asked Castleberry to place his hands in the air in response to Castleberry reaching for his waistband.[2]   In light of the foregoing, the court stated: "Since the State failed to demonstrate sufficient facts to create reasonable suspicion for the detention of [Castleberry]," the seizure of the baggie containing cocaine was the result of a Fourth Amendment violation.[3]

## State's Petition for Discretionary Review

We granted the State's petition for discretionary review to determine whether: (1) "[t]he court of appeals improperly required reasonable suspicion to justify a consensual encounter between Officer Barrett and Mr. Castleberry;" and (2) "[i]n assessing the totality of the circumstances for reasonable suspicion, the court of appeals employed an improper presumption that Mr. Castleberry's conduct in reaching for his waistband was innocent and improperly ignored key facts that the trial court found to be true."

## Analysis

We review a trial judge's ruling on a motion to suppress by viewing all of the

---

[1]  *State v. Castleberry*, No. 05-09-00743-CR, 2010 Tex. App. LEXIS 339, at *6 (Tex. App.—Dallas, Jan. 20, 2010) (not designated for publication).

[2]  *Id.* at *7.

[3]  *Id.*

evidence in the light most favorable to the trial judge's ruling.[4] When the trial judge makes explicit findings of fact, we afford those findings almost total deference as long as the record supports them,[5] regardless of whether the motion to suppress was granted or denied.[6] Therefore, the prevailing party is entitled to "the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence."[7] We afford the same amount of deference to the trial judge's rulings on mixed questions of law and fact, if those rulings turned on an evaluation of credibility and demeanor.[8] Other mixed questions of law and fact are reviewed de novo.[9] So, whether the facts surrounding Officer Barrett and Castleberry's interaction constitute a consensual police-citizen encounter or a Fourth Amendment detention is subject to a de novo review.[10]

We recognize that there are numerous ways in which police-citizen encounters might

---

[4] *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008) (citing *Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007); *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000)).

[5] *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

[6] *Garcia-Cantu*, 253 S.W.3d at 241.

[7] *Id.*

[8] *Guzman*, 955 S.W.2d at 89.

[9] *Kothe v. State*, 152 S.W.3d 54, 62–63 (Tex. Crim. App. 2004).

[10] *Garcia-Cantu*, 253 S.W.3d at 241; *Kothe*, 152 S.W.3d at 62–63.

unfold.[11] The Supreme Court has determined that there are three distinct types of interactions between police and citizens: (1) consensual encounters, which require no objective justification;[12] (2) investigatory detentions, which require reasonable suspicion;[13] and (3) arrests, which require probable cause.[14] When a police-citizen encounter is consensual, the Fourth Amendment and its protections are not implicated.[15] An officer is just as free as anyone to stop and question a fellow citizen.[16] And a citizen is free to terminate a consensual encounter at will.[17] An officer may, without reasonable suspicion, request identification and information from a citizen.[18] Even if the officer did not tell the citizen that the request for identification or information may be ignored, the fact that the citizen complied with the request does not negate the consensual nature of the encounter.[19]

An encounter is no longer consensual when an officer, through physical force or a

---

[11] *Terry v. Ohio*, 392 U.S. 1, 13 (1968); *Garcia-Cantu*, 253 S.W.3d at 242.

[12] *Florida v. Bostick*, 501 U.S. 429, 434 (1991).

[13] *Terry*, 392 U.S. at 30–31.

[14] *Gerstein v. Pugh*, 420 U.S. 103, 111–12 (1975).

[15] *Bostick*, 501 U.S. at 434; *see Florida v. Rodriguez*, 469 U.S. 1, 5–6 (1984).

[16] *Bostick*, 501 U.S. at 434–35; *Garcia-Cantu*, 253 S.W.3d at 243.

[17] *Crain v. State*, 315 S.W.3d 43, 49 (Tex. Crim. App. 2010).

[18] *Hiibel v. Sixth Judicial District Court of Nevada*, 542 U.S. 177, 185 (2004); *Bostick*, 501 U.S. 434–35; *Immigration and Naturalization Service v. Delgado*, 466 U.S. 210, 216 (1984).

[19] *Delgado*, 466 U.S. at 216.

showing of authority, has restrained a citizen's liberty.[20] At this point, the interaction is considered an investigatory detention or arrest, both of which are Fourth Amendment seizures.[21] And when a seizure takes the form of a detention, Fourth Amendment scrutiny is necessary[22]—it must be determined whether the detaining officer had reasonable suspicion that the citizen is, has been, or is about to be engaged in criminal activity.[23] But there is no bright-line rule to determine when an encounter becomes a seizure.[24] Instead, courts must take into account the totality of the circumstances surrounding the interaction to determine whether a reasonable person would have felt free to ignore the police officer's request or terminate the encounter.[25] "A court must step into the shoes of the defendant and [make this determination] from a common, objective perspective . . . ."[26] If ignoring the request or

---

[20] *Brendlin v. California*, 551 U.S. 249, 254 (2007); *Bostick*, 501 U.S. at 434; *Delgado*, 466 U.S. at 215; *United States v. Mendenhal*, 446 U.S. 544, 552 (1980); *Garcia-Cantu*, 253 S.W.3d at 242.

[21] *Crain*, 315 S.W.3d at 49.

[22] *Bostick*, 501 U.S. at 434; *Garcia-Cantu*, 253 S.W.3d at 242.

[23] *Rodriguez*, 469 U.S. at 5; *State v. Sheppard*, 271 S.W.3d 281, 287 (Tex. Crim. App. 2008).

[24] *Brendlin*, 551 U.S. 255; *Garcia-Cantu*, 253 S.W.3d at 243.

[25] *Brendlin*, 551 U.S. at 255; *United States v. Drayton*, 536 U.S. 194, 201 (2002); *California v. Hodari D.*, 499 U.S. 621, 627–28 (1991); *Bostick*, 501 U.S. at 439; *Delgado*, 466 U.S. at 215.

[26] *Garcia-Cantu*, 253 S.W.3d at 244.

terminating the encounter was an option, then no Fourth Amendment seizure has occurred.[27] Additionally, when a suspect fails to yield to a show of physical force and there has been no actual use of physical force, then there is no seizure.[28] The time, place, and surrounding circumstances must be taken into account, but the officer's conduct is the most important factor in determining whether a police-citizen interaction is a consensual encounter or a Fourth Amendment seizure.[29]

Further, if a police officer reasonably suspects that a person is armed, a limited pat down of that person is permissible.[30] The State has the burden to present facts sufficient to show reasonable suspicion.[31] Whether the State has met its burden must be determined by considering the specific facts known by the officer at the moment of detention.[32] This determination of reasonable suspicion may also be "based on commonsense judgments and inferences about human behavior."[33]

In this case, the State first contends that the court of appeals improperly required

---

[27] *Brendlin*, 551 U.S. at 255; *Drayton*, 536 U.S. at 201; *Hodari D.*, 499 U.S. at 627–28; *Bostick*, 501 U.S. 439; *Delgado*, 466 U.S. at 215.

[28] *Hodari D.,* 499 U.S. at 621.

[29] *Garcia-Cantu*, 253 S.W.3d at 244.

[30] *Arizona v. Johnson*, 129 S. Ct. 781, 784 (2009); *Terry* 392 U.S. at 27.

[31] *Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001).

[32] *Davis v. State*, 947 S.W.2d 240, 243 (Tex. Crim. App. 1997).

[33] *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).

reasonable suspicion to justify a consensual encounter between Officer Barrett and Castleberry. The State is correct. Indeed, both the trial judge and the court of appeals failed to properly identify the type of interaction that initially occurred between Officer Barrett and Castleberry.

The court of appeals agreed with the trial judge that when Officer Barrett initially approached Castleberry, he did not have reasonable suspicion that Castleberry was a threat or that a crime had occurred, was occurring, or was about to occur. But this was a consensual police-citizen encounter; whether Officer Barrett had reasonable suspicion is therefore of no consequence.[34] By taking into account the totality of the circumstances, we conclude that a reasonable person in Castleberry's position would have felt free to decline Officer Barrett's request for identification and information.

As noted above, an officer's conduct is a determinative factor in deciding whether an interaction was a consensual encounter or Fourth Amendment seizure.[35] Officer Barrett testified that as he approached Castleberry and his companion, he "asked them for ID [and] questioned them why they were walking through there." And the trial judge found that Officer Barrett approached Castleberry for the express purpose of obtaining his identification and determining why he was there at that time of night. Because an officer is just as free as anyone to question, and request identification from, a fellow citizen, Officer Barrett's

---

[34] *Bostick*, 501 U.S. at 434.

[35] *Garcia-Cantu*, 253 S.W.3d at 244.

conduct shows that the interaction was a consensual encounter.[36]

Next, we consider the time, place, and surrounding circumstances of the interaction. We have explained that a "reasonable person would feel freer to terminate or ignore a police encounter in the middle of the day in a public place where other people are nearby than he would when parked on a deserted, dead-end street at 4:00 a.m."[37] Castleberry testified that he was walking from a bar to his apartment, which was located approximately one block from where he was arrested. He explained that the area was "well lit enough where you could, you know, see what's going on." Officer Barrett said that a person would not need a flashlight to walk there safely because it was lit by "ambient light from the surrounding . . . area." Castleberry also explained that the area has "quite a bit" of foot traffic at 3:00 a.m. Under these facts, we conclude that a reasonable person in Castleberry's shoes would have felt free to terminate the encounter, making it consensual.

The State also contends that in assessing the totality of the circumstances for reasonable suspicion, the court of appeals employed an improper inference that Castleberry's act of reaching for his waistband was innocent conduct, and it ignored key facts that the trial judge found to be true. Once again, the State is correct.

The court of appeals agreed with the trial judge that none of Castleberry's actions

---

[36] *Bostick*, 501 U.S. at 434–35; *Delgado*, 466 U.S. at 216.

[37] *Garcia-Cantu*, 253 S.W.3d at 249 n.42.

indicated that Officer Barrett or anyone else was in jeopardy.[38] But this conflicts with the fact that when Officer Barrett asked Castleberry to produce his identification, Castleberry reached for his waistband. The court of appeals agreed with the trial judge's reasoning that the waistband is a common location for carrying identification.[39] By doing so, the court of appeals determined that Castleberry could have been innocently reaching for his identification and agreed with the trial judge that Officer Barrett went "too far."[40] It is true that Castleberry could have been reaching for his identification. But "[t]he possibility of an innocent explanation does not deprive the officer of the capacity to entertain reasonable suspicion of criminal conduct. Indeed, the principal function of [an] investigation is to resolve that very ambiguity . . . ."[41] Officer Barrett admitted that, at that point, he did not know if Castleberry was carrying a weapon—and the trial judge included this in his findings of fact.

If an officer has a reasonable belief that a citizen may be armed, a limited pat down of that citizen is permissible.[42] And "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances

---

[38] *Castleberry*, 2010 Tex. App. LEXIS 339, at *6.

[39] *See id.* at *7 n.1.

[40] *Id.*

[41] *Woods v. State*, 956 S.W.2d 33, 37 (Tex. Crim. App. 1997); *accord United States v. Arvizu*, 534 U.S. 266, 274–75, 277–78 (2002).

[42] *Terry*, 392 U.S. at 27.

would be warranted in the belief that his safety or that of others was in danger."[43] In *Glazner v. State*, a police officer admitted that he did not "immediately perceive [the] appellant to be a threat."[44] But, because the officer saw what looked like a knife in Glazner's pocket, he conducted a pat down.[45] Glazner challenged the pat down.[46] But, because the officer "believed, based on observation and experience, that appellant had a knife," we held that the pat down was justified.[47] Likewise, when Officer Barrett first made contact with Castleberry, he had no reason to believe Castleberry was a threat, nor did the officer immediately observe any weapons. But Officer Barrett did find Castleberry behind a closed business in a high crime area. And when asked for his identification, Castleberry reached for his waistband, an act that could be reasonably construed as reaching for a weapon. At that point, Officer Barrett did not know if Castleberry was carrying a weapon. We thus conclude that a reasonably prudent person in the same circumstances as Officer Barrett would be warranted in believing that his or her safety may be in danger.[48] Officer Barrett's brief detention and weapons frisk of Castleberry was justified under these circumstances.

---

[43] *Id.*

[44] 175 S.W.3d 262, 265 (Tex. Crim. App. 2005).

[45] *Id.* at 264.

[46] *Id.* at 264–65.

[47] *Id.* at 265.

[48] *See Worthey v. State*, 805 S.W.2d 435, 439 (Tex. Crim. App. 1991).

Finally, we note an alternative basis on which to reverse the trial judge's and court of appeals's decision. As stated above, when a suspect refuses to yield to physical force or an officer's show of authority, there is no seizure.[49] Here, despite Officer Barrett's repeated demands to Castleberry to put his hands above his head, Castleberry ignored the orders and tossed the baggie of cocaine on the ground. Officer Barrett then arrested Castleberry. Under the Fourth Amendment, Castleberry was not seized until he was arrested. Because Castleberry voluntarily abandoned the cocaine before he was arrested, the cocaine was not the fruit of a seizure.[50]

## Conclusion

The court of appeals failed to separate Castleberry and Officer Barrett's encounter into two distinct parts: (1) Officer Barrett's initial approach of Castleberry, which was a consensual encounter; and (2) Castleberry's act of reaching for his waistband, which provided Officer Barrett with reasonable suspicion to detain and frisk Castleberry. We therefore reverse the court of appeals's judgment, hold the seized contraband to be admissible, and remand the cause to the trial court.

DATE DELIVERED: March 2, 2011
PUBLISH

---

[49] *Hodari D.*, 499 U.S. at 626, 629.

[50] *Id.*; *Swearingen v. State*, 101 S.W.3d 89, 101 (Tex. Crim. App. 2003).